**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0242-23

CLORINDA PISANO,

       Plaintiff-Respondent/
       Cross-Appellant,

v.

JOHN PISANO,

       Defendant-Appellant/
       Cross-Respondent.

_____

Argued September 25, 2025 – Decided October 10, 2025

Before Judges Mawla, Marczyk, and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-0122-18.

Brian G. Paul argued the cause for appellant/cross-respondent (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Brian G. Paul, of counsel and on the briefs).

Eric S. Solotoff argued the cause for respondent/cross-appellant (Fox Rothschild, LLP, attorneys; Eric S.

Solotoff, of counsel and on the briefs; Adam Wiseberg, on the briefs).

PER CURIAM

Defendant John Pisano appeals and plaintiff Clorinda Pisano cross-appeals from an August 16, 2023 final judgment of divorce entered following a thirteen-day trial. We affirm.

The parties were married for nearly thirty years when plaintiff filed her complaint for divorce in August 2017, commencing this lengthy divorce proceeding. Three children were born during the marriage. The two eldest children were emancipated when this matter commenced and the youngest was emancipated before trial. The parties lived an upper-class lifestyle, which included expensive homes, cars, personalty, clothing, and vacations funded exclusively by income from defendant's lucrative law practice. Plaintiff had not been in the workforce for thirty years; she was a homemaker and raised the children.

On April 26, 2017, the parties entered a cutoff agreement stipulating an end date for the marriage for purposes of alimony and equitable distribution of May 1, 2017. The same day, defendant withdrew $300,000 from their home equity line of credit (HELOC), increasing the marital debt. He repaid the sum drawn on the HELOC on May 16, 2017, after the agreed upon cutoff date.

2

The parties jointly retained an appraiser to value their personal property as of March 13, 2018. The personalty appraised for $521,077.

Numerous pendente lite orders were entered by various judges who handled the matter prior to trial. In October 2017, defendant agreed to pay all of plaintiff's shelter and transportation expenses, and unreimbursed medical expenses for plaintiff and the youngest child. On October 12, 2017, the court ordered defendant to pay plaintiff pendente lite support of $25,000 per month, continue paying for the family memberships to two country clubs, pay off various credit cards, and pay for housekeeping services. The court also determined plaintiff had inappropriately withdrawn funds from a joint bank account. She was ordered to pay $296,000 into an attorney trust account.

Plaintiff occupied the marital residence and refused to grant access to it. As a result, on November 16, 2017, the court entered an order directing her to arrange for landscaping and snow removal services and allow service providers to access the residence.

During the marriage, the parties did not timely pay their taxes and did not pay anything towards their 2017 taxes when this action was initiated. By December 2017, defendant had paid the federal 2016 taxes in full but they still owed $250,000 in state taxes. As a result, on December 14, 2017, the court

3

reduced the pendente lite support to $10,000 per month to account for the unpaid taxes. The court also limited defendant's personal spending to $10,000 per month, and again ordered him to pay plaintiff's unreimbursed medical expenses.

For the 2017 taxes, defendant requested both parties execute a hold harmless agreement, which was signed on October 11, 2018. He insisted on a similar document for the 2018 tax obligations. When plaintiff's counsel pointed out there were material discrepancies in the 2018 tax returns, defendant refused to provide the documentation supporting the tax filings. Instead, he filed the 2018 tax return as a joint filing without obtaining plaintiff's approval.

On April 2 and June 4, 2018, the court again ordered defendant to pay various outstanding credit card balances, which it originally ordered him to pay in October 2017, and ordered him to pay nearly $14,000 in unreimbursed medical expenses. The court denied his request for a change of venue, noting it was an attempt to forum shop.

On July 26, 2018, plaintiff filed an emergent application to compel defendant to pay for the youngest child's college tuition. Defendant ultimately paid it.

On August 22, 2018, the court entered an order finding defendant violated plaintiff's rights by not paying her unreimbursed medical expenses. On October

4

18, 2018, the court ordered defendant to refrain from engaging in self-help by taking unilateral deductions from the pendente lite support.

In 2020, the parties exchanged correspondence about repair and maintenance issues to prepare the marital home for sale. Plaintiff claimed structural and plumbing repairs were necessary due to pre-existing issues which had developed since the parties built the residence decades prior. Defendant asserted plaintiff's guests were responsible for damaging doors and workers had damaged the gutters. In December 2021, defendant obtained an estimate for the required repairs to the marital residence totaling $977,000.

From July 2019 through May 2022, defendant refused to provide his business records. The court ordered him to answer supplemental discovery requests for this information.

On June 4, 2021, the court again found defendant in violation of litigant's rights for refusing to pay pendente lite support. By then, the support arrears totaled over $58,000.

On January 28, 2022, the court again ordered defendant to pay plaintiff's unreimbursed medical expenses. On January 31, 2022, the court found defendant in violation of litigant's rights for not paying the unreimbursed medical expenses and ordered payment of the maintenance and repair costs at

A-0242-23

the marital home and the youngest child's college tuition. On May 4, 2022, the court found defendant in violation of its discovery orders.

Trial began in February 2023. The parties, their forensic accountants, and defendant's employment rehabilitation expert testified.

Plaintiff's testimony detailed the characteristics of the parties' upper-class lifestyle. Defendant was the breadwinner throughout the marriage and at sixty-one years of age, plaintiff remained dependent on him. As a result, when defendant fell behind on his pendente lite support payments in 2019, plaintiff was unable to pay the monthly expenses or her attorneys, or to save money. However, she testified defendant told her he had been saving throughout the litigation. Plaintiff also testified she was not aware defendant had taken $300,000 from the HELOC prior to the parties' signing the cutoff agreement.

Plaintiff admitted withdrawing $296,000 from the joint account. She explained it was out of concern defendant would close the credit cards and not pay her pendente lite support. She only wanted half of the $296,000 and intended to shield the money from defendant.

Defendant testified he ran a solo law practice. He was almost sixty-two years old at the time of trial.

A-0242-23

Defendant detailed the extensive renovations, maintenance, and landscaping he performed, or paid others to perform, on the house during the marriage. Regarding the taxes, he explained the parties' practice was to pay late. The parties owed approximately $997,000 in back taxes at the time of trial.

Defendant testified plaintiff should be responsible for the debt associated with the withdrawal from the HELOC. He explained that, in the years preceding the divorce, he had paid down the mortgage on the marital home in lieu of paying the state and federal taxes on time. Doing so allowed the parties to refinance the mortgage, thereby saving them mortgage interest over time. However, he conceded this strategy only caused the parties to accumulate tax debt. For example, they owed over $1.6 million in taxes for 2016 alone.

In 2019, after the divorce began, defendant purchased a home in Westfield, secured a mortgage, and began paying down the mortgage. He also paid all the outstanding tax debt but never informed plaintiff or the court. Defendant also admitted he spent large sums of money, which he deducted as a business expense to pay for renovations on his Westfield home. He later sold the home for $2 million but never disclosed it, and made large six-figure contributions to his pension when the court was entering pendente lite orders enforcing his pendente lite support obligation.

A-0242-23

On February 15, 2023, during trial, the parties entered a consent order requiring defendant to pay $250,000 in counsel fees, without prejudice, to plaintiff's counsel for the ongoing divorce litigation. The consent order also established conditions for the sale of the marital residence, including selecting the realtor and paying the commission, correcting code violations, cooperating with the realtor, and establishing each party's right of first refusal to match any third-party offer.

Following the trial, the parties entered another consent order on April 10, 2023. They agreed plaintiff's share of defendant's law practice was $1,100,000. Adjusted for personalty, jewelry, an automobile, and the advance of $250,000 to plaintiff's attorney, plaintiff received a net payment of $865,750.

The trial judge issued the judgment of divorce and a detailed written statement of reasons. The judge applied the N.J.S.A. 2A:34-23(b) alimony factors to the facts adduced at trial. He concluded defendant's average net income for 2013 to 2016 was $1,528,844. The judge observed, although defendant testified "he should be entitled to slow down," he "offered no evidence of a need to cut back." Regardless, the judge concluded this was unrealistic within the context of a divorce. The judge "sensed [defendant] sought to intentionally obfuscate the facts" about his income, particularly his post-

complaint earnings. Documents related to his post-complaint earnings showed "greater net incomes than [defendant] presented to the court."

Although plaintiff had no earned income, the judge observed she would be receiving around $865,700 as her share of equitable distribution "and maybe some other liquidity." Plaintiff would also receive a distribution representing her share of the marital residence, but this distribution would be used by her to secure a new home. Assuming a five percent rate of return on the $865,700, plaintiff's unearned income would be $43,285, but this also assumed she did not use the money to pay her attorney's fees.

Although defendant's employability expert testified plaintiff could work as a teacher, the judge declined to impute more than a minimum wage to her because plaintiff would be sixty-three years old by the time she received the proper teacher training. He concluded plaintiff was older and too unskilled to compete with others for a teaching job. The judge also rejected defendant's assertion plaintiff could collect $4,000 per month in social security at sixty-two years of age because she would only be eligible for one-half of defendant's benefit. Requiring plaintiff to claim social security early was infeasible because although defendant "[wa]s able to retire and end his alimony obligation, she will need as much income as possible."

A-0242-23

The judge characterized the family's lifestyle as "very high-end." The parties were once members of two country clubs, and the marital residence covered over 14,000 square feet and had a pool, tennis court, and other amenities. The parties owned expensive German, Italian, and British automobiles, jewelry, and collectibles. The children attended private schools and expensive colleges that were funded without debt. The family "shopped at high-end stores," vacationed often, "frequented high-end New York City restaurants. . . . In short, they spared no expense." Post-complaint, defendant lived in a Florida home worth more than $7.7 million, which he purchased with his pension funds.

The judge relied, in part, on the lifestyle accounting prepared by plaintiff's expert. The parties' expenses, without the children's costs, were isolated and quantified, and the judge's opinion explained in detail how he adjusted the lifestyle figures.

Defendant argued the parties had not saved during the marriage. However, the judge observed defendant had "saved a million dollars in retirement funds since the divorce complaint[,] which he claims fortuitously grew through investment seven or eight-fold." Defendant would reach full retirement age for social security purposes in less than five years (fifty-seven

10

months).  And "[w]hile no law states or implies there must be dollar-for-dollar savings equality, to obtain a future value of one million dollars in [fifty-seven] months would require [plaintiff] to save approximately $12,300 per month prospectively at [five percent]."  The judge concluded the parties were

> entitled to a similar lifestyle as the marital lifestyle not just for the years until [defendant] retires, which might be less than five years away, but to a lifestyle that can be sustained as much as possible into the retirement years.  Otherwise they have a thirty[-]year marriage, they live well for almost five years post-judgment, and then [defendant] continues to live high off the hog while [plaintiff] relies on public assistance.  That cannot possibly be what is intended by the state's alimony scheme.

The judge quantified the family's marital standard of living based on spending at $97,239 per month.  Plaintiff's needs and share of the Schedule A, B, and C expenses totaled $43,223 per month.  The judge added $1,000 per month to this sum for health insurance plaintiff would have to purchase post-judgment and a monthly savings component of $12,300.  The grand total of plaintiff's quantified lifestyle was $55,523 per month, which the judge reduced by $5,070 per month, representing plaintiff's imputed earned income and unearned income.  This left an uncovered amount of $50,453 per month, which the judge rounded down to $50,450.

11

The judge opined that if defendant retired at sixty-seven, plaintiff's lifestyle would be drastically reduced because she would have to rely on "her investment income, . . . [and] earned income provided she ever commences working and continues to work past her own [sixty-seventh] birthday, and [s]ocial [s]ecurity." Her social security would be one-half of defendant's. If defendant retired, he would no longer have an earned income, but he had more assets, which he could liquidate, and twice the amount of social security. Defendant could also "build up an equal amount of investment income as [plaintiff] during the next [fifty-seven] months. He will be in better stead than she." Given defendant's net income prior to the complaint exceeded $1,528,844 per year, the judge concluded that "paying his wife $605,400 per year in alimony is doable and fair." Defendant had the ability to pay alimony based on his post-complaint earnings as well.

The judge concluded both parties would be able to enjoy a standard of living comparable to the marital lifestyle until defendant retires. "After that, it will be difficult."

The duration of the marriage also supported an open durational alimony. Plaintiff was healthy enough to work, and defendant adduced no evidence

12

regarding his health status. The duration of the pendente lite support did not affect the duration of the alimony.

Neither party brought any significant assets into the marriage. However, post-complaint, defendant deposited $1.3 million into his pension and "made a small fortune . . . resulting in the pension purchasing [his Florida home] for $7,375,000 on February 1, 2022." The judge noted "[t]here was no evidence presented of the pension investment, . . . no evidence [of] how [the money] grew," nor evidence of the down payment to purchase the Florida residence, "in spite of [p]laintiff's effort, repeatedly, to discover the information."

The judge ordered defendant to pay plaintiff open durational alimony of $50,450 per month. He then turned to the parties' requests for Mallamo[1] credits.

The judge found plaintiff had "no significant investment from which to produce income" pendente lite, and it was not appropriate to impute an earned income at the outset of the case. Therefore, her pendente lite needs were approximately $55,500 per month as calculated for alimony. However, from 2018 and throughout the lengthy pendente lite period until 2023, the judge imputed to her an average yearly net income between $19,743 and $25,053. Although plaintiff had a responsibility to support and pay for the youngest

_____

[1] Mallamo v. Mallamo, 280 N.J. Super. 8 (App. Div. 1995).

child's college pendente lite, the judge found defendant had paid substantial sums for the child's education. The judge rejected plaintiff's proofs regarding child-related expenses.

The judge detailed the amount of pendente lite support defendant paid compared with plaintiff's spousal support needs during the pendente lite period and concluded there was an overall deficit of $412,037.50. However, this did not entitle plaintiff to a Mallamo credit because the judge then detailed the "exorbitant" expenses defendant paid for the youngest child. Based on the evidence presented, the judge surmised defendant may have paid $492,000 for the youngest child "during the pendente lite period, and even thousands more for [her] and her siblings." In addition, defendant paid the youngest child's share of the Schedule A, B, and C expenses, which the judge found "heavily" favored defendant. Defendant also paid plaintiff's share of the credit card debt exceeding $33,423, which further factored into the pendente lite expenses.

Although the judge was "unable to conduct exact math, [he was] confident that while [defendant] has not overpaid support, neither has he underpaid. . . . The proofs [were] simply insufficient to order otherwise." Therefore, the judge denied both parties' requests for a Mallamo adjustment.

The judge turned to the equitable distribution and applied the facts he found to the N.J.S.A. 2A:34-23.1 factors, which we need not repeat here. Regarding the parties' assets, the judge began with the former marital home and observed that even though the parties had entered a consent order controlling the process for sale of the home, defendant's aim was to keep it. Although plaintiff argued defendant tried to sabotage the sale, the judge "decline[d] to speculate as to what [defendant]'s interference, if there was any, cost the parties in terms of market value, putting aside . . . the lack of maintenance."

The parties did not dispute the mortgage debt on the marital residence. The point of contention was the HELOC defendant drew from near the agreed upon cutoff date. The judge concluded the HELOC transactions were suspicious and rejected defendant's testimony about the reasons for accessing the line of credit. He concluded the debt on the residence for equitable distribution purposes totaled $1,094,779.10, representing $1,000,000 for the mortgage and $94,779.10 for the HELOC.

The judge next addressed the marital home's state of disrepair. He found "[d]efendant's attempts to cast blame on [p]laintiff [in this regard were] disingenuous." Defendant had access to the property, and the onus was on him to make the necessary repairs. However, because defendant

15

> wanted to buy out [p]laintiff's interest, [he] has attempted throughout the litigation to minimize the house value and . . . he intentionally allowed maintenance issues to slide so he could claim the house needed $1,000,000 in maintenance and repairs to bring it up to snuff, thereby lowering the value and . . . reducing what he would have to pay [plaintiff].

The judge detailed the problems with the home and although they could be fixed as the parties had done during the marriage, it was defendant's strategy not to make them to "undermine a fair market value sale to a third party so he [could] steal equity from [plaintiff]." The judge concluded defendant was acting in bad faith. As a result, when the home sold or when defendant matched a third-party offer, the sale price would be reduced by $1,094,779.10 and the net value distributed equally between the parties except that from defendant's half, $250,000 would be paid to plaintiff. "The $250,000 is an adjustment for [d]efendant's bad faith as there is no way the court would be able to quantify the loss in marketability due to his shenanigans[,] which the court deems intentionally manipulative."

The judge ruled defendant's Westfield property was exempt from equitable distribution because it was purchased post-cutoff. However, he noted the residence had been sold prior to the last few days of trial and defendant never disclosed it. Defendant's "misdirection in this regard is consistent with his

practice before the court of not being forthright." Related to the savings issue, the judge observed defendant "performed tens of thousands of dollars of construction/renovations on the Westfield property" and deducted the renovations as business expenses for tax purposes.

The judge also found defendant's Florida residence exempt from equitable distribution as a post-cutoff asset. Defendant claimed he purchased the residence using his exempt pension funds but failed to provide proof. The judge rejected plaintiff's argument the home was not exempt because there were "no other known [marital] assets at the cut[-]off date [that] could possibly have been the source of the down payment." Although the purchase of the home was evidence defendant exceeded the $10,000 monthly spending limit imposed on the parties pendente lite, the judge reasoned he had "afforded [plaintiff] her due" in the alimony and Mallamo decisions, "meaning [defendant's] post-[complaint] income could be used on this asset and remain exempt."

Defendant failed to disclose the Florida property on any of his case information statements (CISs). Although plaintiff also failed to disclose an asset on her CISs, the judge found defendant's conduct was driven by a combination of carelessness and intentionality. Defendant's clear "goal throughout was to minimize his assets and income to cheat his wife out of an appropriate alimony

17

award and an equitable distribution of property." He never answered discovery requests regarding the pension he claimed funded the purchase of the home. Although defendant complained about not having enough money, the judge observed he owned "three-multimillion-dollar homes and upgrad[ed] his Ferrari while temporarily buying an Aston Martin."

The judge addressed the value of the parties' bank accounts, automobiles, personalty, and collectibles. Plaintiff argued she sold collectibles pendente lite to pay her expenses because defendant was either late or short in paying pendente lite support. Thus, the judge did not need to equitably distribute the collectibles. The judge rejected her argument, noting she had received full pendente lite support and permitting her to keep the proceeds would be unjust. He established a mechanism for valuing and distributing this property.

The judge was unable to definitively determine the marital portion of the credit card debt because the parties did not provide the requisite proofs. However, the judge noted he used defendant's obligation to pay for the pre-cutoff credit card debt "as part of the calculus in finding he had paid substantial sums pendente lite limiting his Mallamo obligation."

Defendant claimed the judge should also distribute the 2016 and 2017 tax debt between the parties. The judge found the parties' practice of paying taxes

late was "all driven by [defendant] with [plaintiff,] the acquiescent party." Defendant's "gambit to pay taxes in the spring of 2017 was for no purpose other than to beat his own cut[-]off date by drawing from the HELOC to deprive his wife of as much equitable distribution as he could." The judge declined to make plaintiff bear the 2016 or 2017 tax liability because her share of the burden was satisfied by the fact alimony was calculated using net incomes.

The tax deficiencies for the years preceding 2016 were marital debts and the judge divided them equally. For the years following 2017, defendant sought a credit for plaintiff's failure to file joint returns. However, the judge noted defendant had in fact filed joint returns in 2018 and 2019, even though plaintiff "never signed or authorized her signature on those returns."

The judge addressed other minor credits plaintiff sought for pendente lite arrears, $5,000 of the HELOC funds defendant took for himself but did not account for, and the youngest child's expenses. He credited her with one-half of the arrears, reasoning that the other half was accounted for by the fact she had not contributed her fair share to the youngest child's expenses. He also awarded her half of the escrowed funds.

Both parties requested counsel fees. The judge applied the Rule 5:3-5(c) and RPC 1.5 factors to the facts.

A-0242-23

The judge found that after alimony is paid, both parties had the ability to bear their fees. He concluded defendant was unreasonable in his efforts to avoid paying plaintiff her share of his law practice and the marital lifestyle. In addition to the expensive homes, cars, and personalty under defendant's control, defendant's post-complaint lifestyle included several vacations, domestic and international, and expensive gift purchases. He found "[d]efendant put aside approximately $1.3 million dollars in pension funds over a four-year period post complaint. Yet he constantly begrudges his wife's lifestyle even distantly, approaching his own. That is bad faith."

Defendant also acted unreasonably when claimed he was entitled to attorney's fees as a pro se litigant, contrary to law. "[H]e finally conceded [the issue], but only after exhausting [p]laintiff with his insistence, running up legal fees."

Plaintiff was not blameless. Prior to the divorce trial, a different judge conducted a seven-day hearing about expensive jewelry pieces plaintiff claimed were lost or missing. That judge found plaintiff's testimony was not credible and ultimately concluded she had possession of the items. The judge also found defendant was no better because he was combative and his testimony inconsistent.

A-0242-23

The divorce trial was no different. Defendant was "difficult" and made derogatory remarks about the judges who had presided in the case, including a judge who attempted to mediate the divorce, which we need not repeat here.

Defendant was self-represented for a portion of the trial. He interrupted witnesses and would "blurt out inappropriate exclamations of pretended shock, and demonstrably gesticulate his frustration, disgust, or shock—little of which the [judge] observed to be genuine." As a witness, defendant refused to answer questions directly and "would instead pontificate his own agenda." Defendant would "stomp[] off the witness box . . . to speak with co-counsel or retrieve documents without even requesting leave of court. . . . More than once [defendant] answered his cell phone while he was in the witness box to conduct business . . . ." The judge found "[h]is conduct protracted the trial exponentially. . . . [H]e pressed non-meritorious claims and contentions[,] . . . did not display candor with the court or his adversary[, and] failed to disclose material facts."

The trial judge also painstakingly reviewed the orders, which had been entered prior to the trial. He listed no less than thirty-seven instances in which one or both parties had either acted unreasonably or had violated an order. Specifically, plaintiff shared the blame for the misconduct on at least fourteen

21

occasions and defendant on at least twenty-seven occasions. Both parties used self-help.

The judge found there was nothing novel about the parties' case. It had become "protracted principally because [defendant] sought to pay [plaintiff] less than she was entitled to in support and sought to deny her an equitable share of assets while shifting to her an inordinate amount of debt."

The judge concluded both parties bore some of the fault, but defendant's conduct was "substantially more egregious" because he failed to stay within the $10,000 monthly budget set for him by the court. "[H]is expenses exponentially exceeded the cap. Yet he endlessly maintained he complied. Plaintiff regularly, with great expense, was forced to pursue discovery from [d]efendant." Defendant unnecessarily moved to transfer venue. "Constantly[,] orders were issued respecting support arrears, failure to pay credit cards, failure to pay [the youngest child's college] expenses . . . and otherwise, failure to pay unreimbursed medical expenses." Defendant violated civil restraints entered between the parties more than once. His emergent motions and motions for reconsideration were rejected. Defendant violated court orders, the mediation privilege, and "filed a nonsense motion for summary judgment as to the quantum of marital debt." He advanced "specious arguments" and motions.

22

After adjustments, the judge found plaintiff had been billed attorney's fees of $816,702.16 and paid $475,799.04. Defendant had been billed $249,379.63 and as best as the judge could surmise, he paid $153,742.49.

The judge concluded the $325,000 defendant paid plaintiff as an advance for counsel fees without prejudice would be converted into a with-prejudice payment. Plaintiff would be responsible for the remainder of her fees, and defendant would be responsible for all his fees without a contribution from her.

The judge ordered the parties to bear the personalty appraiser's fees equally. Each party would be responsible for their forensic accounting expert's fees. The judge reiterated this was because "with alimony, the [c]ourt sought to place [plaintiff] on an equal footing with [defendant]."

## I.

"[F]indings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998). "We do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." M.G. v. S.M., 457 N.J. Super. 286, 293 (App. Div. 2018) (quoting Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (internal quotation marks omitted)). This is because the Family Part has "special jurisdiction and expertise in family

23

matters," which often requires the exercise of reasoned discretion. Cesare, 154 N.J. at 413. If we conclude there is satisfactory evidentiary support for the trial judge's findings, our "task is complete and [we] should not disturb the result." Beck v. Beck, 86 N.J. 480, 496 (1981) (quoting State v. Johnson, 42 N.J. 146, 161-62 (1964)).

"Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Our deference is required in this respect because the trial judge "hears the case, sees and observes the witnesses, [and] hears them testify," affording them "a better perspective than a reviewing court in evaluating the veracity of witnesses." Ibid. (alteration in original) (internal quotation marks omitted) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)).

We do not "accord the same deference to a trial judge's legal determinations. Rather, all legal issues are reviewed de novo." Ricci v. Ricci, 448 N.J. Super. 546, 565 (App. Div. 2017) (citation omitted) (citing Reese v. Weis, 430 N.J. Super. 552, 568 (App. Div. 2013)). "[L]egal conclusions, and the application of those conclusions to the facts, are subject to our plenary

review."  <u>Reese</u>, 430 N.J. Super. at 568 (citing <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995)).

## II.

### A.

On appeal, defendant argues the judge erred when he included the $12,300 as a monthly savings component in the alimony award because savings were not a part of the marital lifestyle and the alimony award, without the savings component, already captured the lifestyle.  He asserts the judge committed a mistake of law when he awarded a sum greater than the marital lifestyle and ignored <u>Crews v. Crews</u>, 164 N.J. 11 (2000) and its progeny, including <u>S.W. v. G.M.</u>, 462 N.J. Super. 522 (App. Div. 2020).

Defendant asserts the $12,300 was based on speculation, namely, that he would retire at age sixty-seven, yet there was no evidence to support this conclusion.  Even if defendant were to retire, the Legislature already fashioned a remedy and a process for evaluating whether alimony should continue, terminate, or be modified in N.J.S.A. 2A:34-23(j).

Family Part judges have broad discretion to make alimony determinations.  <u>See</u> <u>Martindell v. Martindell</u>, 21 N.J. 341, 355 (1956).  "In reviewing an alimony

A-0242-23

award, we typically defer to the trial judge's findings and reverse only where there is an abuse of discretion." S.W., 462 N.J. Super. at 530.

"[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews, 164 N.J. at 16. "The standard of living during the marriage is the way the couple actually lived, whether they resorted to borrowing and parental support, or if they limited themselves to their earned income." Hughes v. Hughes, 311 N.J. Super. 15, 34 (App. Div. 1998).

Alimony is "a right arising out of the marriage relationship to continue to live according to the economic standard established during the marriage as far as economic circumstances will allow." Aronson v. Aronson, 245 N.J. Super. 354, 364 (App. Div. 1991); see also Crews, 164 N.J. at 16, 27 (stating the court shall consider the parties' need for new residences, increase in expenses associated with both parties maintaining a standard of living "reasonably comparable to the standard of living [established] during the marriage"). Thus, alimony is neither a reward nor a punishment and is not a windfall for the party who receives it. Aronson, 245 N.J. Super. at 364.

A-0242-23

The marital lifestyle is important and is the measure used to establish alimony. S.W., 462 N.J. Super. at 532-33. The court must consider how the parties actually lived, calculate the amount of money associated with the lifestyle, and then apportion the lifestyle figures and numbers to the supported spouse. Id. at 532; see also Weishaus v. Weishaus, 360 N.J. Super. 281, 290-91 (App. Div. 2003), rev'd in part on other grounds, 180 N.J. 131, 181 (2004) ("[T]he court [should consider] marital residence, vacation home, cars owned or leased, typical travel and vacations each year, schools, special lessons, and camps for [the] children, entertainment (such as theater, concerts, dining out), household help, and other personal services.").

However, lifestyle is not the end of the inquiry. Crews held that "[i]n contested divorce actions, once a finding is made concerning the standard of living enjoyed by the parties during the marriage, the court should review the adequacy and reasonableness of the support award against this finding." 164 N.J. at 26 (emphasis added). The court must always consider what is equitable. Glass v. Glass, 366 N.J. Super. 357, 372 (App. Div. 2004). An alimony award is not fixed by finding the lifestyle alone because there are other considerations.

The Legislature acknowledged these principles when it said the Family Part may award such alimony "as the circumstances of the parties and the nature

of the case shall render fit, reasonable and just." N.J.S.A. 2A:34-23. Although marital lifestyle is key, the alimony statute requires the court to consider thirteen other factors. Here, the judge found the following factors relevant to the alimony amount:

> (1) The actual need and ability of the parties to pay;
>
> (2) The duration of the marriage or civil union;
>
> (3) The age, physical and emotional health of the parties;
>
>     . . . .
>
> (5) The earning capacities, educational levels, vocational skills, and employability of the parties;
>
> (6) The length of absence from the job market of the party seeking maintenance;
>
>     . . . .
>
> (8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;
>
> (9) The history of the financial or non-financial contributions to the marriage or civil union by each party including contributions to the care and education of the children and interruption of personal careers or educational opportunities;

(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;

(11) The income available to either party through investment of any assets held by that party;

. . . .

(13) The nature, amount, and length of pendente lite support paid, if any; and

(14) Any other factors which the court may deem relevant.

[N.J.S.A. 2A:34-23(b).]

Having considered the entire record under the unique circumstances of this case, we conclude none of these factors, which the trial judge's opinion addressed, militated against the award of the additional $12,300 per month to plaintiff. There is no dispute the judge followed Crews and S.W. in deriving the $38,150 as the base alimony award. After reviewing the record and the judge's findings, we are convinced he awarded the $12,300 because he was satisfied the evidence, including but not limited to defendant's post-cutoff spending, the source of which was largely unsubstantiated, showed he had a far greater "opportunity for future acquisitions of capital assets and income," N.J.S.A. 2A:34-23(b)(8), while plaintiff did not.

29

At oral argument, defendant asserted plaintiff's reliance on N.J.S.A. 2A:34-23(b)(8) was an argument first made on appeal rather than a finding by the judge. Preliminarily, we note we review orders, not opinions. Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001) ("[I]t is well-settled that appeals are taken from orders and judgments and not from opinions . . . or reasons given for the ultimate conclusion.").

Regardless, the record dispels defendant's claim. This issue had been roiling the waters virtually from the onset of the litigation. On November 29, 2017, plaintiff filed a certification in opposition to defendant's motion for pendente lite support, complaining about how inequitable it was for him to "retain[] nearly $80,000 per month in net cash flow" while she had "no ability to save for the future/[her] retirement, which is a critical issue given the absence of any such retirement assets in [the] marital estate." In September 2021, plaintiff filed a motion to enforce litigant's rights and certified to the parties' disparate financial circumstances, noting defendant had managed to save $728,165 for retirement during 2019 and 2020.

On May 4, 2022, the court entered an order adjudicating another round of pendente lite motions, including plaintiff's request for an increase in pendente lite support. Its findings noted plaintiff argued for the increase because

30

defendant was "saving hundreds of thousands of dollars a year . . . [and] the parties are approaching retirement age[,] so retirement is a heightened concern." The court correctly concluded "[w]hile savings may not have been normal during the marriage, the requirement to maintain the marital lifestyle is not rigid and recognizes that the parties' circumstances will change as they go through life."

We are unconvinced the trial judge did not consider N.J.S.A. 2A:34-23(b)(8) or that his finding regarding the $12,300 was an invention unsupported by the record. The judge's opinion was replete with findings of how defendant's lifestyle would be virtually unaffected by the divorce, while plaintiff's would be the opposite. For example, unlike defendant, plaintiff would be unable to acquire a home like the marital residence. While plaintiff's needs will undoubtedly be met, the judge's finding is supported by substantial credible evidence in the record that the asset acquisition necessary to maintain plaintiff's lifestyle after defendant retires, would not be feasible without her ability to save.

A savings component allows the recipient of alimony to accumulate savings for the day when alimony ends, due to the former spouse's death or a change in circumstances. Davis v. Davis, 184 N.J. Super. 430, 437 (App. Div. 1982); see Khalaf v. Khalaf, 58 N.J. 63, 70 (1971) (allowing for savings

component in an alimony award); see also Jacobitti v. Jacobitti, 135 N.J. 571, 576 (1994) (permitting the former wife to accumulate reasonable savings). In Lombardi v. Lombardi, we explained that "[a]n appropriate rate of savings . . . can, and in the appropriate case should, be considered as a living expense when considering an award of . . . maintenance." 447 N.J. Super. 26, 38 (App. Div. 2016) (second and third alterations in original) (internal citation and quotation marks omitted). This is because "it is not equitable to require [a] plaintiff to rely solely on the assets she received through equitable distribution to support the standard of living while [the] defendant is not confronted with the same burden." Id. at 40. Equitable distribution is in addition to an alimony award. Ibid.

We have little doubt plaintiff will need to deplete her equitable distribution to provide for herself as defendant's retirement approaches. The judge's findings indicate as much, given the specter of defendant's retirement.

We also reject defendant's assertion the judge speculated about his intent to retire. Setting aside the judge's amply supported findings that defendant sought to avoid paying alimony, defendant moved to Florida in 2022, and testified he wanted to "slow down" and not work as much.

32

The record contains corroborative evidence, namely, defendant's certification dated March 23, 2022, in opposition to a cross-motion filed by plaintiff. In it he certifies he "worked like a dog for far too long." He states: "I have a right to stabilize my finances in anticipation of retirement. . . . I have a right to plan for retirement, like all sixty-one-year-olds." And that "[h]ard work and grit [had] steered [him] to the next stage of life . . . in Florida." The trial judge did not speculate about defendant's retirement.

We also reject defendant's argument the savings component of the alimony was inconsistent with N.J.S.A. 2A:34-23(j)(1). Nothing in N.J.S.A. 2A:34-23(j)(1) restrains the Family Part's ability to consider that its award of open durational alimony may be impacted by a party's retirement soon after the award is made. That is why the Legislature requires consideration of the parties' ages when alimony is established. N.J.S.A. 2A:34-23(b)(3). The same holds true for N.J.S.A. 2A:34-23(b)(8), which also measures time in the form of "the opportunity for future acquisitions of capital assets and income."

Along these lines, defendant's reliance on Boardman v. Boardman is misplaced. 314 N.J. Super. 340 (App. Div. 1998). There, we vacated the trial court's ruling that alimony would automatically terminate upon the payor's retirement or the payee's cohabitation. Id. at 345-46. We observed that the

33

payee's "financial dependence will not automatically terminate when [the payor] stops working. Nor will [the payor's] ability to pay. Any modification should abide the event, especially here, where the supporting spouse is many years away from normal retirement age." Id. at 346-47.

The facts here are different from Boardman. The Boardman trial judge did not consider the marital lifestyle or the payee's medical needs, and imputed an unrealistically high income to the payee. Id. at 345. Here, the opposite occurred. The judge thoroughly analyzed the marital lifestyle and the parties' needs.

The parties in Boardman were married for twenty-three years but were in their mid-forties at the time of the divorce and had three children who were not yet teenagers. Id. at 343. Here, the parties are older, with retirement on the horizon, and their children's expenses were no longer a factor, permitting the judge to readily identify the proper alimony amount.

Boardman also operated under a different legal rubric. Prior to the 2014 alimony reforms, the law established that "in certain circumstances, good faith retirement at [full retirement] age . . . may constitute changed circumstances for purposes of modification of alimony and . . . a hearing should be held to determine whether a reduction in alimony is called for." Id. at 346 (third

34

alteration in original) (quoting Silvan v. Sylvan, 267 N.J. Super. 578, 581 (App. Div. 1993)).  N.J.S.A. 2A:34-23(j)(1) changed the law and now provides for a rebuttable presumption that alimony shall terminate when the obligor reaches full retirement age, unless the court finds the presumption has been overcome after considering the factors set forth in N.J.S.A. 2A:34-23(j)(1)(a)-(k).

We also reject defendant's argument the $12,300 was a form of deferred equitable distribution disguised as alimony.  Nothing in the judge's findings indicates he saw this figure as a form of equitable distribution.  The judge's reference to the sums defendant was able to save was merely to point out a savings capability, which plaintiff simply did not have.  Defendant's failure to inform the court and plaintiff he had satisfied the taxes in 2019 stunted plaintiff's ability to save during the five years of litigation by seeking an increase in pendente lite support.  This was not an attempt to make an equitable distribution of post-cutoff earnings or equalize income or assets.  Thus, the award of the savings component to secure plaintiff's future was not an abuse of discretion.

B.

On the cross-appeal, plaintiff argues the judge erred when he did not award her a Mallamo credit for the underpayment of pendente lite support, which the court quantified at $451,429.  She asserts the judge speculated when

he found defendant had paid $492,000 in pendente lite expenses for the youngest child, which erased the Mallamo credit. Even if the $492,000 was correct, plaintiff's one-half share was $246,000. Therefore, she should have received a Mallamo credit of at least $206,000, reflecting approximately $40,000 of her prior payments for the youngest child.

In analyzing a request for a Mallamo adjustment, a court must consider whether the amount of pendente lite support paid "was consistent with the marital lifestyle." Slutsky v. Slutsky, 451 N.J. Super. 332, 369 (App. Div. 2017). "Any changes in the initial orders rest with the trial judge's discretion" and are therefore reviewed by us for an abuse of discretion. Id. at 368.

Although the trial judge found defendant's pendente lite support payments were short by $451,429, defendant had paid: plaintiff's credit card debt of $39,391.47; the youngest child's high school and college tuitions, and expenses through May 2022, totaling $343,750; sixty-seven months of the child's health insurance, totaling $33,500; unreimbursed medical expenses of $81,606; and sports and extracurricular activities of $33,000. The grand total of the pendente lite expenses paid for the youngest child was $492,000.

Although plaintiff claimed she paid approximately $40,000 in college expenses, her evidence did not substantiate that claim. Some expenses were

charged to a credit card and could not be tied to the child's costs. Plaintiff also claimed she deposited funds into the child's bank account but presented no objective evidence to corroborate her testimony. The evidence supports the judge's finding that, even if plaintiff paid the amounts she claimed, "in no reality do these expenses approach her obligation" to pay for half of the child's expenses.

Plaintiff's argument for the Mallamo credit ignores the amounts defendant paid for the youngest child, the income imputed to plaintiff, and the money she owed defendant for payment of past-due taxes. The judge's calculation of the amounts paid by defendant is supported by the objective evidence in the record.

The judge subtracted the $246,000 plaintiff owed for the child's expenses from the $412,037.50 in outstanding pendente lite support defendant owed, which yielded $166,037.50 due to plaintiff. However, the judge adjusted the $166,037.50 by the net income imputed to plaintiff of approximately $135,039 after taxes for 2018 to 2023. The judge then subtracted $135,039 from $166,037.50, which resulted in an approximate balance of unpaid pendente lite support in the amount of $30,998.50.

The judge then found defendant paid approximately $300 for the youngest child's college books, $5,000 for her rent and utility expenses, and $2,200 for

37

gasoline and credit card charges. This reduced the unpaid pendente lite support to $23,498.50. The judge also noted plaintiff owed defendant $33,423.03 "for her share of the income [taxes] for 2005, 2006, 2007, and 2014." Defendant also paid for the décor of the child's off-campus apartment, cell phone, additional college expenses, meal plan, and commuter plan. Although he did not assign a dollar figure to these items, the judge's calculations showed defendant had paid more than his share of the obligation.

Given the lack of support for plaintiff's claims and the evidence supporting the judge's findings regarding the youngest child's expenses, the judge validly concluded the sums paid by defendant for the youngest child were more than the amount owed to plaintiff. The denial of the Mallamo credit was not reversible error.

III.

Defendant argues the judge violated equitable distribution principles when he enhanced the equity of the marital residence while assigning the burden of the 2016 joint tax liabilities to him. He claims the judge penalized him for paying down the mortgage and increasing the equity in the marital residence in lieu of paying taxes. The judge did not acknowledge the connection between

the mortgage debt paydown and the resulting tax liabilities, which resulted in an unjust equitable distribution.

Defendant also argues the judge contradicted a pendente lite order when he awarded plaintiff a $250,000 credit for the devaluation of the marital residence caused by his neglect. On cross-appeal, plaintiff asserts she should have received a $500,000 credit based on defendant's own proofs, which showed the home needed $1,000,000 worth of repairs.

Family Part judges have broad discretion to allocate assets in equitable distribution. Clark v. Clark, 429 N.J. Super. 61, 71 (App. Div. 2012) (citing Steneken v. Steneken, 367 N.J. Super. 427, 435 (App. Div. 2004)). The breadth of this discretion also includes the allocation of debt. See Monte v. Monte, 212 N.J. Super. 557, 566-67 (App. Div. 1986).

An equitable distribution does not mean an equal distribution. Rothman v. Rothman, 65 N.J. 219, 232 n.6 (1974). In certain instances, "it may not be an abuse of judicial discretion to divide the assets of the parties equally without requiring them to share the debts." Monte, 212 N.J. Super. at 567. N.J.S.A. 2A:34-23.1 "requires an equitable distribution be 'designed to advance the policy of promoting equity and fair dealing between divorcing spouses.' This policy is best implemented by evaluating the facts and evidence associated with

each asset." <u>M.G.</u>, 457 N.J. Super. at 295 (internal citation omitted) (quoting <u>Barr v. Barr</u>, 418 N.J. Super. 18, 45 (App. Div. 2011)).  Our review is confined to whether the decision was based on the sufficient, credible evidence in the record, and if it considered the controlling legal principles.  <u>Id.</u> at 294.

### A.

The equitable distribution of the 2016 tax debt and the equity in the marital residence was not reversible error.  The evidence supports the judge's finding that the parties' method of paying the taxes late was driven exclusively by defendant.  His aim was to pay the 2016 taxes by using the HELOC before the cutoff date to deprive plaintiff of equitable distribution by encumbering the marital residence and then repaying the HELOC following the cutoff.  The record shows defendant had $2 million at his disposal, which he did not use to pay the taxes.  Under these circumstances, it was not erroneous to require defendant to bear the debt while shielding plaintiff from the loss of equity.

### B.

We reject the parties' arguments relating to the $250,000 credit to plaintiff on account of the marital residence's devaluation due to its state of disrepair.  Both parties had a hand in the dilapidation of the residence, with defendant bearing greater responsibility.

A-0242-23

Pendente lite, defendant was ordered to pay the maintenance and repair costs for the marital home, while plaintiff, as the home's occupant, was to arrange for certain services and refrain from preventing service providers from accessing the home. This order mirrored the evidence that during the marriage defendant oversaw the home maintenance. However, defendant also wanted to buy out plaintiff's interest in the home. He resisted a pendente lite sale of the residence and at trial testified he wanted to purchase the home.

With this as the background, the evidence also showed that during the divorce, defendant attempted to devalue the home by not addressing its maintenance problems. The judge's findings that defendant acted intentionally are supported by the record. Contrary to defendant's arguments on appeal, the repairs needed were more profound than landscaping, gutter cleaning, and dead insect removal, which arguably could be ascribed to plaintiff.

Plaintiff testified the home required substantial foundation, structure, and masonry repairs, which were long-term issues not caused by her pendente lite neglect. Her testimony was supported by an estimate defendant obtained, showing nearly $1 million in necessary repairs, including: $200,000 for the patios, walkways, retaining walls, and railings; $100,000 for rotted doors and windows; $150,000 for roofing and gutters; $50,000 for the foundation repairs;

41

$75,000 for new heating and air conditioning; $25,000 for plumbing; $40,000 for flooring; $30,000 for bedroom construction costs; $20,000 for window adjustments; $60,000 to repair the tennis court; $172,000 to repair lighting, the structure of an adjacent cottage, electrical work, and the well-piping system; and $50,000 for landscaping.

We reject defendant's assertion the condition of the marital residence was attributable to plaintiff's violation of the November 16, 2021 pendente lite order. That order said: "Plaintiff SHALL directly arrange for all landscaping/snow removal services for the marital property. Plaintiff SHALL ensure that the landscaping/snow removal service providers have access to the landscaping/snow removal equipment at the marital home." The order did not assign plaintiff with responsibility for maintenance of the home's exterior. Nor could it, given the parties' historical roles in caring for the home.

We discern no abuse of discretion in the $250,000 credit to plaintiff for the devaluation of the marital residence and reject both parties' arguments that the figure was either too low or arbitrarily determined and therefore excessive. The evidence amply supports the judge's finding defendant attempted to lower the value of the residence and make it unappealing to buyers. However, the evidence also shows the state of the residence was not entirely attributable to

defendant and instead was also the product of long-term wear and tear, defendant's intentional neglect, and plaintiff's failure to robustly address her obligations for the landscaping.

Having considered the judge's decision in light of the record, it is clear to us the $250,000 accounted for defendant's misconduct and dissipation of the value of the marital residence, while simultaneously accounting for plaintiff's role in the neglect and normal repairs. This ruling was a sound exercise of the judge's broad discretion.

IV.

Finally, plaintiff argues the judge should have awarded her more in counsel fees given his finding defendant had acted in bad faith. She asserts the judge overlooked other instances of defendant's bad faith and more was required than re-designating the without-prejudice pendente lite advance of $325,000 from defendant as a with-prejudice payment. Although the judge addressed the factors for an award of counsel fees, plaintiff claims he did not properly consider the parties' respective financial circumstances, namely, defendant's continued, considerable wealth and her indebtedness to her attorneys.

The award of counsel fees and costs in matrimonial actions rests in the sound discretion of the trial court. Williams v. Williams, 59 N.J. 229, 233

(1971). Where the judge follows the caselaw, statutes, rules, and makes appropriate findings of fact, the fee award is entitled to deference. <u>Yueh v. Yueh</u>, 329 N.J. Super. 447, 466 (App. Div. 2000). We will disturb a counsel fee determination "only on the 'rarest occasion,' and then only because of clear abuse of discretion," <u>Strahan v. Strahan</u>, 402 N.J. Super. 298, 317 (App. Div. 2008) (quoting <u>Rendine v. Pantzer</u>, 141 N.J. 292, 317 (1995)), or "a clear error in judgment." <u>Tannen v. Tannen</u>, 416 N.J. Super. 249, 285 (App. Div. 2010). The essence of deferring to a trial court's reasoned findings means we should not interfere, even if we "might have reached a different conclusion were [we] the trial [court]." <u>State v. Locurto</u>, 157 N.J. 463, 471 (1999).

There is no doubt defendant's misconduct stood out from plaintiff's role in contributing to this prolonged litigation. However, the judge's bad faith findings relating to defendant concerned specific instances for which he compensated plaintiff. This proper exercise of the judge's discretion is demonstrated by the fact that he did not allow defendant's misconduct in certain instances to color his view of the case altogether or lose sight of plaintiff's lack of credibility and misdeeds. The counsel fee determination was neither a clear abuse of discretion nor an error in judgment.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0242-23